1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

TRINA CHRISTIE, in her personal capacity
and as representative of the Estate of Anthony
Christie; C.C., a minor in his personal
capacity,

Plaintiffs,

v.

STATE OF WASHINGTON
DEPARTMENT OF CORRECTIONS, et al.,

Defendants.

Case No. 3:22-cv-05692-TMC

ORDER ON DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT

## I.      INTRODUCTION

Anthony Christie died by suicide in September 2019 while in detention at Monroe

Corrections Complex (MCC) for an alleged violation of his community custody sentence. That

detention was his sixth in 2019. During each previous detention that year, he disclosed that he

had experienced suicidal thoughts or previously attempted suicide. In response, MCC staff

typically placed him on suicide watch, referred him for further evaluation, or took other suicide

prevention measures. During his final detention, however, Anthony[1] did not disclose any past or

present suicidality. And this time, MCC did not implement any suicide prevention measures.

---

[1] The Court refers to Anthony Christie and Trina Christie by their first names to avoid confusion.
The Court means no disrespect.

Instead, they placed Anthony in general housing, where staff only checked on inmates hourly. On September 21, 2019, two officers were performing a formal count when they found Anthony lying face down in his cell. When he did not respond to their attempts to wake him, they called for assistance. When the officers opened the cell door and approached Anthony, they discovered a ligature around his neck, and blood and vomit on his face. Attempts to revive him were unsuccessful.

Anthony's mother, Trina Christie, and his son, C.C., bring this action on behalf of themselves and Anthony's estate against the State of Washington Department of Corrections (DOC) and DOC staff members and contractors. They argue that given extensive documentation of Anthony's suicidal history, DOC and the individual defendants either knew or should have known Anthony was at risk of attempting suicide, even if he did not disclose suicidal ideation during his final detention. They claim that failure to take precautions amounts to negligence in violation of Washington state law and deliberate indifference to Anthony's clearly established Fourteenth Amendment right to medical treatment, including suicide prevention.

Defendants Kody Angell, Troy Bushey, Mary Jo Currey, Elaine Gravatt, William Hall, Christopher Hallgren, Valarie Herrington, Rob Herzog, Julie Martin, Jacob Miller, Dianna Mull, Jack Warner, State of Washington Department of Corrections, and John Does 1-10 move to dismiss these claims on summary judgment (Dkt. 68). For the following reasons, the Court GRANTS the motion in part and DENIES it in part.

## II.   BACKGROUND

### A.   Factual Background

After pleading guilty to violating the Uniform Controlled Substances Act, Anthony was sentenced to twenty days in custody and twelve months of community custody with the Washington State Department of Corrections (DOC). Dkt. 71-1. On February 21, 2018, he was

released from confinement and began serving his community custody supervision. Dkt. 71-2 at 38. Miller was assigned as his community corrections officer (CCO) in May 2018. *Id.* at 32. The following discussion of the events leading to Anthony's death is based on the record submitted by the parties, viewing the facts and drawing all reasonable inferences in favor of the non-moving party, as required on summary judgment.

          *1.*     *Policies and procedures for community custody violations*

When someone on DOC community custody fails to report to a CCO as required, the CCO requests a Secretary's Warrant, which authorizes law enforcement to arrest the individual. *See id.* at 30–31. When someone is arrested for failing to report or otherwise violating their DOC community custody requirements in Whatcom County, the arresting CCO brings the individual to the Whatcom County Jail (WCJ). Dkt. 71-6 at 7–8; *see* Dkt. 71-17. Typically, the Whatcom County Sheriff's Office (WCSO)[2] then transports the individual to the Violator Unit (VU) at the MCC Intensive Management Unit (IMU). Dkt. 71-6 at 7–8. But when the individual has medical or mental health issues, the CCO contacts the nurse's desk at DOC headquarters and brings the individual to a local hospital for a "fit-for-jail" medical and mental health evaluation. Dkt. 70-1 at 24–25; Dkt. 71-18 at 6–7; Dkt. 78-5 at 5–7. An individual who does not receive clearance based on the evaluation remains at the local hospital until the hospital's medical and mental health providers clear them. Dkt. 71-18 at 6. When the providers grant clearance, they also decide whether to place the individual in a general population pod (G-Pod), the medical pod (M-Pod), or an inpatient unit for medical observation and treatment, as well as whether to place the individual in the unit or in a closed observation area. *Id.* Individuals who report experiencing

---

[2] DOC later changed its policy such that a CCO would transport the individual from WCJ to the VU.

thoughts of self-harm or suicide may have restricted access to sharp objects and certain clothing. *Id.* at 6–7.

"[W]hen a violator is sent out to the Department of Corrections . . . [the] medical and/or mental health paperwork typically go[es] with the inmate." *See* Dkt. 77 at 5 (citing Dkt. 71-6 at 9). Regardless of whether a person receives a hospital evaluation of their fitness for jail, DOC policy requires assessing each detainee upon arrival at a DOC facility through initial health and mental health screenings. Dkt. 78-2 at 5. Health screenings must be conducted within 16 hours of arrival; mental health screenings must be conducted within one business day of arrival. *Id.* Providers are to document the detainee's mental health status on the "DOC 13-349 Intersystem/Restrictive Housing Mental Health Screening" and assign the detainee "PULHES" codes. *Id.* at 5–6. DOC uses a coding system called "PULHES" to "assist in determining the best placement for living and working for Incarcerated Individuals." Dkt. 78-3 at 2. The system gives an incarcerated person a set of numerical designations, or codes, corresponding to 12 different factors, designated by letter. *Id.* The relevant factors here are "Mental Health Service Utilization," or "S," and "Suicide Risk," or "R." *Id.* DOC policy provides that "[i]n facilities with onsite mental health, screenings completed by a provider that does not specialize in mental health will be reviewed by a mental health employee/contract staff the next business day." Dkt. 78-2 at 5.

DOC policy also requires creating a health record for all "offenders housed in [DOC] facilities . . . to provide continuity of care." Dkt. 71-15 at 3. The record must contain "[a]ll medical, dental, and mental health information." *Id.* It "serves as the single comprehensive source of accurate chronological documentation of all health care services provided to an offender in a [DOC] facility." *Id.* Further, "[p]revious health records of offenders who are readmitted will be incorporated into the new health record." *Id.*

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 4

The VU does not, however, maintain comprehensive health records for all offenders. An investigative report by the Office of Corrections Ombuds describes the record-keeping practices at the VU as follows:

> [M]edical records for the violator population are placed in "red folders" to distinguish them from blue binders which house records for the regular incarcerated individuals. Each time an incarcerated individual arrives at the facility on a violation, a new red folder is generated; once the individual is released or transferred, the red folder is placed into a drawer. If the same incarcerated individual returns to the facility on another violation, another new red folder is generated; the DOC HQ staff reported that the records from prior stays are not incorporated into the new folder, so any information from prior stays is not carried forward.

Dkt. 71-20 at 7.

The VU houses those detained and awaiting a hearing for an alleged community custody violation or serving a sanction for such a violation. Dkt. 78-21 at 6. The VU contains one hundred cells divided into six pods. *Id.*; Dkt. 70-1 at 97. Four of the pods are G-Pods. *See* Dkt. 70-1 at 113. One is an L-Pod, or an administrative segregation pod for those who were not following VU rules, and one is the M-Pod, which houses violators with high medical or mental health needs. *Id.* at 47, 112–13; Dkt. 71-18 at 6. Radu Muresan, a VU correctional officer, explained that:

> M pod would be like a more heightened watch pod. That's going to be normally your guys that are coming in detoxing or have mental health issues like somebody seeing – seeing things or hearing things, they'll normally go to our M pod. And they're supposed to be monitored more often than somebody who's on general population pods.

*Id.* at 109.

Officers periodically conduct safety checks of each cell in the VU. For "tier checks," the officer quickly looks in each cell window to check "for obvious signs of life" to ensure the inmate is "okay and []alive." *Id.* at 113. Officers conduct tier checks of G-Pods and L-Pod every hour, but officers conduct tier checks of M-Pod every thirty minutes. *Id.* at 98. The staff

performs tier checks in a "staggered and random pattern" so that "they're not conducted [at the] same time" each check. *Id.* at 100. Officers also conduct a "formal standing count" twice per eight-hour shift. *Id.* at 114. For formal standing counts, each inmate must stand and give a verbal response. *Id.* at 113.

### 2.    *Trina Christie's calls*

Trina frequently called Miller, Anthony's CCO, to express her concerns about Anthony's mental health, including his suicidality. Dkt. 78-33 at 6; *see* Dkt. 71-2. She testified that she called Miller because she thought of him as "a partner to help guide" Anthony "out of a life of crime and drugs" and help him "get into a better place." Dkt. 78-33 at 6. On May 14, 2018, she left Miller a message telling him that Anthony "may benefit from mental health treatment," and explaining that Anthony was "assaulted in the head approx[imately] 6 months ago and [that] she thinks he might have cognitive issues and maybe a TBI." Dkt. 71-2 at 31. She testified that the last few times she called Miller, she "[a]bsolutely" told him she was concerned about Anthony's suicidality. Dkt. 78-33 at 7–8.

### 3.    *Documentation of Anthony's suicidality during his community custody sentence*

Anthony was arrested and detained six times in 2019 for failing to report as required and other violations of his conditions of custody. *See* Dkt. 71-2. In each of the first five instances, his intake assessment or subsequent mental health evaluation documented his suicidality.

On January 22, 2019, he was arrested and brought first to the WCJ. Dkt. 71-2 at 19. His WCJ intake form states that he had suicidal thoughts about jumping in a river within the last six months, but that he had not developed a plan or acted on these thoughts; the form also states that he had attempted suicide seven years before, but not within the last six months. Dkt. 71-4 at 2. WCSO flagged him as suicidal and gave him a risk classification score of two out of five, which corresponds to WCJ housing placement on "[c]lose watch on the first floor." *Id.*; Dkt. 71-5 at 2.

1
2
3
4
5

On February 28, 2019, Anthony was arrested for violating his conditions of custody. Dkt. 71-2 at 34. Anthony's WCJ intake form says he had suicidal thoughts about an hour before booking, but neither acted on the thoughts nor developed a plan. Dkt. 71-7 at 3. The form also indicates that Anthony had two black eyes from a punch to the face about one week before the evaluation. *Id.* at 2. He was later transferred to MCC. *See* Dkt. 71-2 at 15.

6
7
8
9
10
11
12

On March 25, 2019, Miller arrested Anthony for failure to report. Dkt. 71-2 at 12 Anthony told him "he wanted to not be alive anymore" and that "he is suicidal all the time." *Id.* Miller contacted the DOC nurse's desk, which directed him to bring Anthony to the hospital for a fit-for-jail assessment. *Id.* At Saint Joseph Hospital, the physician noted that Anthony said "he is hopeless as there [were] suicidal thoughts every day" but indicated that he "has no plan." Dkt. 71-8 at 6. On the fit-for-jail form, the physician specified that Anthony should be placed on suicide watch. *Id.*; Dkt. 71-9 at 2.

13
14
15
16
17
18
19
20
21
22
23
24

On June 6, 2019, WCSO arrested Anthony for use of a controlled substance. Dkt. 71-2 at 8–9. DOC placed a hold on Anthony while he was in custody because his arrest was a violation of his community custody conditions. *Id.* A form from a mental health evaluation on June 9 indicates that the evaluation was conducted because WCJ received information regarding Anthony's history of suicidal behavior, depression, and ADHD. Dkt. 71-10 at 2. The evaluation included a suicide risk assessment, which indicated that he sometimes experienced suicidal ideation, that he had a history of low lethality suicide attempts, and that he had no plan. *Id.* at 6. It also evaluated other risk factors, including substance abuse, his support systems, and his history of custody. *Id.* Despite the presence of suicidal thoughts and other risk factors, his evaluation score corresponded to placement in "housing as needed" and was too low to yield placement on the first floor with 15- or 30-minute safety checks. *Id.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

On August 6, 2019, Miller arrested Anthony for alleged misdemeanors and booked him in WCJ. Dkt. 71-2 at 7. On his intake form at WCJ, Anthony reported having suicidal thoughts and "sporadic" thoughts of self-harm. Dkt. 71-11 at 3. In his suicide assessment, he reported that within the last six months, he had suicidal thoughts and "act[ed] on these thoughts . . . , or develop[ed] a plan or self-harm[ed]." Dkt. 71-12 at 2. As a result, he received the highest possible risk classification score, five out of five, indicating that he should be placed on suicide watch. *Id.*

The following day, once he was transferred to MCC, Gravatt, a registered nurse, filled out his mental health screening form. *See* Dkt. 78-16. She wrote that "6 months ago," Anthony "tried to hurt or kill [him]self" by "[h]eadbang/hang."[3] *Id.* at 2. She also noted that Anthony has attempted "suicide by cop," and that he was not thinking of hurting or killing himself at the time of intake. *Id.* Next to the question "[d]o you feel you need mental health services now," Gravatt wrote "Mental health chart."[4] *Id.* On the "Primary Encounter Report," presumably the "chart," Gravatt explained: "Violator has [history] of thoughts of self-harm–6 mon[th]s ago, was thinking of hanging himself, Bang his head open to suicide. He did not actually do it but has long thoughts . . . . Will have mental health [illegible] to see him." Dkt. 78-17 at 2. Gravatt assigned him to M-Pod. *Id.* There is no record of a follow-up "assessment by a mental health provider." Dkt. 71-20 at 7.

22

23

24

---

[3] The handwriting on the form is difficult to read, but next to the follow up question "[h]ow many times?", it appears to say "awhile thoughts" or "awful thoughts." *See* Dkt. 78-16 at 2. It is thus unclear whether this answer refers to attempts or thoughts of suicide.

[4] The handwriting is unclear but appears to say "chart." *See* Dkt. 78-16 at 2.

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 8

1

2
       *4.      Anthony's September 2019 detention and suicide*

On September 19, 2019, Miller arrested Anthony for violating the terms of his

community custody. Dkt. 71-2 at 3. Anthony admitted to drinking and using methamphetamine

three days before the arrest. *Id.* Two other CCOs brought Anthony to WCJ and booked him

there. *Id.* Miller testified that Anthony did not disclose that he was suicidal during this arrest.

Dkt. 70-1 at 34. Anthony did not report to WCJ staff that he was suicidal, even when asked if he

had any suicidal ideation. *Id.* at 42. Miller did not convey his previous knowledge of Anthony's

suicide risk to the jail or MCC. Dkt. 78-13 at 15.

WCSO transported Anthony to MCC, *see* Dkt. 71-6 at 7; Dkt. 71-18 at 3, where Bushey,

a registered nurse, and Herrington, a Licensed Mental Health Counselor (LMHC), performed

initial screenings on September 20, Dkt. 78-24; Dkt. 78-26. Anthony's Intersystem/Restricted

Housing Mental Health Screening form states that he denied ever having "tried to hurt or kill

[him]self," "receiv[ing] therapy or medication for a mental health concern and/or suicide

attempt," or receiving a mental health diagnosis. Dkt. 78-24 at 2. He also denied feeling he

needed mental health services at that time. *Id.* He did, however, disclose that he used

methamphetamine daily and last used it four days before. *Id.* Based on this information,

Herrington marked that Anthony should be placed in general population housing and did not

mark him for referral for mental health appraisal. *Id.* Consistent with DOC's practice for VU

detainees, Herrington did not obtain Anthony's health records from previous detentions from the

archive file room. *See* Dkt. 78-25 at 10.

The next day, September 21, correctional officer Hall performed tier checks of Anthony's

pod around 2:00 p.m. and 3:00 p.m. Dkt. 71-18 at 4. Video footage of each tier check shows Hall

briefly glance in a small window on Anthony's cell door as he walked by without pausing.

Dkt. 22 at 14:17:32; Dkt. 23 at 15:13:40–42. Around 4:00 p.m.,[5] Hall and another correctional officer, Angell, performed a formal standing count, and found Anthony lying face-down on the floor of his cell next to the bed, with his head and neck covered by the desk. *Id.*; Dkt. 71-18 at 4. Hall and Angell attempted to get Anthony's attention for a few minutes, but he remained nonresponsive. Dkt. 71-18 at 4. Angell made an emergency radio call alerting VU staff that they found a nonresponsive inmate during the count. *Id.* Two other correctional officers, Radu Muresan and John Geisler, responded to the call. *Id.* at 5. They attempted to awaken Anthony by knocking on the door with keys. *Id.* Sergeant Mull arrived and instructed the officers to open the cell door to check on him. *Id.*

When they approached Anthony, they saw a ligature around his neck, as well as blood and vomit on his face. *Id.* Geisler noticed Anthony's leg was cold to the touch. *Id.* They untied the ligature and performed CPR until they were relieved by Emergency Medical Services. *Id.* Efforts to revive Anthony lasted for 33 minutes before a time of death was announced at 4:30 p.m. *Id.* at 2. Plaintiffs' expert witness, Dr. Kris Sperry, opined "to a reasonable degree of medical certainty, that Anthony Christie had been dead for a period of several hours when his body was discovered." Dkt. 78-43 at 7.

## B.   Procedural History

Anthony's mother, Trina, and his son, C.C., filed this case in King County Superior Court. *See* Dkt. 1-1. On September 16, 2022, it was removed to the U.S. District Court for the Western District of Washington. Dkt. 1, 9. Plaintiffs filed an amended complaint on April 19, 2023 against Defendants Kody Angell, Areig Awad, Kevin Bovencamp, Troy Bushey, Mary Jo Currey, John Geisler, Elaine Gravatt, William Hall, Christopher Hallgren, Valarie Herrington,

---

[5] The stated timing of the formal standing count differs at different places in the record. The Court uses "around 4:00 p.m." for simplicity.

Rob Herzog, Arben Kullojka, Julie Martin, Jacob Miller, Dianna Mull, Radu Muresan, Stefan Rose, Jack Warner, State of Washington Department of Corrections, and John Does 1-20. Dkt. 40. They later filed a stipulated motion to dismiss Defendants John Geisler and Radu Muresan with prejudice, Dkt. 61, which the Court granted, Dkt. 62. Defendants filed this motion for summary judgment, Dkt. 68, and Plaintiffs filed a response, Dkt. 77. Before Defendants filed their reply, Dkt. 85, the parties filed a stipulated motion to dismiss Defendants Kevin Bovencamp, Areig Awad, Stefan Rose, and Arben Kullojka, Dkt. 80, which the Court granted, Dkt. 83. Accordingly, the remaining defendants are Kody Angell, Troy Bushey, Mary Jo Currey, Elaine Gravatt, William Hall, Christopher Hallgren, Valarie Herrington, Rob Herzog, Julie Martin, Jacob Miller, Dianna Mull, Jack Warner, State of Washington Department of Corrections, and John Does 1-10. Plaintiffs have also filed a motion for summary judgment, Dkt. 69, which the Court will rule on in a separate order.

### III.    DISCUSSION

#### A.    Legal Standard: Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The evidence relied upon by the nonmoving party must be able to be "presented in a form that would be admissible in evidence." *See* Fed. R. Civ. P. 56(c)(2). "An affidavit or declaration

used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also* Fed. R. Ev. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony."). Conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not be "presume[d]." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). However, as stated, "'[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam) (quoting *Anderson*, 477 U.S. at 255). Consequently, "a District Court must resolve any factual issues of controversy in favor of the non-moving party only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied." *Lujan,* 497 U.S. at 888 (internal quotations omitted).

**B.    The Fourteenth Amendment applies to Plaintiffs' Section 1983 claim.**

The parties disagree as to whether Plaintiffs' Section 1983 claim arises under the Eighth Amendment or the Fourteenth Amendment. *See* Dkt. 68 at 10; Dkt. 77 at 8. The Eighth Amendment's guarantee against cruel and unusual punishment protects "inmates serving custodial sentences following a criminal conviction," whereas the Fourteenth Amendment's Due Process Clause protects pretrial detainees, who "have not yet been convicted of a crime and therefore are not subject to punishment by the state." *Sandoval v. County of San Diego*, 985 F.3d 657, 667 (9th Cir. 2021). As someone who was in custody for an unadjudicated community custody violation arising from a previous conviction, Anthony does not fall squarely into either of these categories.

Defendants point to *Nordenstrom for Est. of Perry v. Corizon Health, Inc.*, No. 3:18-CV-01754-HZ, 2021 WL 2546275 (D. Or. June 18, 2021), which relies on *Flores v. Mesenbourg*, No. 95-17241, 116 F.3d 483, 1997 WL 303277, at *1 (9th Cir. June 2, 1997), an unpublished disposition in which the Ninth Circuit determined that the Eighth Amendment applied where the plaintiff was detained and awaiting a parole revocation hearing. *Id.* The panel reasoned that the Eighth Amendment applied because the plaintiff "was subject to incarceration for [a] parole violation because he had originally been convicted and given the sentence which was moderated by parole. His original conviction is the authority under which he was confined after his parole violation." *Id.*

But in *Sandoval*, 985 F.3d at 669, a more recent published opinion, the Ninth Circuit applied the Fourteenth Amendment deliberate indifference standard to claims by a probationer.[6] There, officers found methamphetamine during a probation compliance check and arrested the probationer for violating the terms of his probation and for new drug charges. *Id.* at 662. The probationer died by overdose shortly after arriving to the jail, and never had a revocation hearing. *Id.* at 664.

Here, as in *Sandoval*, Anthony was arrested for an alleged violation of his conditions of custody and was awaiting his revocation hearing when he died.[7] *See* Dkt. 71-2 at 3. His claims thus arise under the Fourteenth Amendment. *See Hanson v. Blaine County.*, No. 1:16-CV-00421-BLW, 2021 WL 1601391, at *2 (D. Idaho Apr. 23, 2021) (holding Fourteenth Amendment applies under *Sandoval* where parolee was arrested and held without a hearing).

---

[6] The distinction between a person on parole, probation, and community custody is immaterial. *See Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) (finding no "difference relevant to the guarantee of due process between the revocation of parole and the revocation of probation").

[7] Anthony's hearing was scheduled for September 26, 2019. Dkt. 71-2 at 3.

1

2

3

4

5

6

7

8

9

10

11

12

But even if *Sandoval* were not binding, the weight of persuasive authority supports application of the Fourteenth Amendment standard. Although parolees are not entitled to the "full panoply of rights" due defendants in a criminal proceeding, they nonetheless have valuable, albeit conditional, liberty, the termination of which inflicts a "grievous loss." *Morrissey v. Brewer*, 408 U.S. 471, 480, 482 (1972). They thus have a due process right to a preliminary hearing and a revocation hearing. *Id.* at 490. And although the parolee's arrest stems from his prior conviction, "a parolee's interest in maintaining the freedoms afforded by his parole is a distinct Fourteenth Amendment right." *Hanington v. Multnomah County*, 593 F. Supp. 3d 1022, 1033 (D. Or. 2022) (citing *Morrissey*, 408 U.S. at 482) (holding the Fourteenth Amendment governs a parolee's claims because "any punishment inflicted on [the parolee] based on his alleged parole violation would violate the Fourteenth Amendment"), *appeal dismissed sub nom. Hanington v. County of Multnomah*, No. 22-35282, 2023 WL 6585898 (9th Cir. June 2, 2023).

13

**C.      Qualified Immunity**

14

15

16

17

18

19

20

21

22

23

24

Defendants argue they are entitled to qualified immunity. Dkt. 68 at 23–24. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). In analyzing a qualified immunity defense at summary judgment, the Court must determine: (1) "whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right," and (2) "whether the right in question was clearly established at the time of the violation." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle*, 566 U.S. at 664 (cleaned up). Although the qualified immunity doctrine does not "require a case directly on point" to show that a right is clearly established,

"existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

While the plaintiff bears the burden of proving a right was "clearly established" at the time of the allegedly impermissible conduct, the Court should draw on its "full knowledge of relevant precedent rather than restricting [its] review to cases identified by the plaintiff." *Gordon v. County of Orange*, 6 F.4th 961, 969 (9th Cir. 2021) (*Gordon II*). For a right to be clearly established, "the prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Id.* (quotation marks and citation omitted).

The two steps need not be analyzed sequentially; judges may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 234 (2009).

    1.    *Whether the right in question was clearly established*

        *a)*    *Personally participating defendants and supervisory defendants*

Plaintiffs argue that the alleged constitutional right at issue is the right to mental health treatment in state custody. Dkt. 77 at 32–33 (citing *Sandoval*, 985 F.3d at 667). They cite district court cases holding that there is a clearly established right to mental health care while incarcerated, including suicide prevention. *Id.* (collecting cases).

With respect to the personally participating defendants and the supervisory defendants, the Court agrees that in 2019, Anthony had a clearly established right to be free from deliberate indifference to his mental health needs, including his risk of suicide. *See Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1245 (9th Cir. 2010) (holding that, as of 2005, pre-trial detainee had clearly established right to be free from" deliberate indifference to [his] mental health needs

that resulted in [his] suicide"), *overruled on other grounds by Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016); *Conn v. City of Reno*, 591 F.3d 1081, 1095 (9th Cir. 2010) (holding that "[a] heightened suicide risk or an attempted suicide is a serious medical need"), *cert. granted, judgment vacated*, 563 U.S. 915 (2011), *and opinion reinstated*, 658 F.3d 897 (2011); *Cabrales v. County of Los Angeles*, 864 F.2d 1454, 1461–62 (9th Cir. 1988) (holding deliberate indifference to suicidal pretrial detainee's medical and psychological needs proves a Fourteenth Amendment violation), *cert. granted, judgment vacated*, 490 U.S. 1087 (1989), *and opinion reinstated*, 886 F.2d 235 (9th Cir. 1989); *Wright v. Dunne*, No. 15-CV-02671-TLN-CKD, 2020 WL 977963, at *8 (E.D. Cal. Feb. 28, 2020) ("[T]here exists a clearly established right to be free from deliberate indifference to serious mental health needs, including risk of suicide."). The Ninth Circuit's decision in *Gordon v. County of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) ("*Gordon I*"), made clear that the objective deliberate indifference standard applied to such Fourteenth Amendment claims at the time of the events here.

> b)      *Policymaking Defendants Martin, Herzog, Currey, and Warner*

In *Taylor v. Barkes*, 575 U.S. 822 (2015) (per curiam), the U.S. Supreme Court reversed a Third Circuit opinion that had held there was a clearly established right, as of 2004, "to the proper implementation of adequate suicide prevention protocols." *Id.* at 824. The Court concluded that such a right was not established by a Supreme Court decision or a "robust consensus" in the Courts of Appeals. *Id.* at 826. Assuming without deciding that a right can be clearly established by circuit precedent alone,[8] the Court also held that a broader right to adequate suicide prevention protocols was not clearly established by existing Third Circuit authority holding that an officer must not act with deliberate indifference toward the suicide risk

---

[8] As discussed above, this remains the standard in the Ninth Circuit. *Gordon II*, 6 F.4th at 969.

of a particular inmate. *See id.* at 826–27 ("[E]ven if the Institution's suicide screening and prevention measures contained the shortcomings that respondents allege, no precedent on the books in November 2004 would have made clear to petitioners that they were overseeing a system that violated the Constitution.").

Although *Taylor* leaves open the possibility that a jail or prison policy related to suicide prevention could be so deficient that it amounts to deliberate indifference in violation of the Fourteenth Amendment, the relevant Ninth Circuit precedent contains the same distinction as the Third Circuit precedent at issue in *Taylor*: while a detainee has a clearly established right to be free from deliberate indifference toward his individual risk of suicide, there is not precedent clearly establishing a broader right to effective suicide prevention protocols. This Court must therefore consider the distinction between "an individual being deliberately indifferent to the suicidal ideations of a particular inmate and a government entity acting with deliberate indifference toward potential inmate suicides on a policy level." *NeSmith v. County of San Diego*, No. 15CV629 JLS (JMA), 2016 WL 4515857, at *6 (S.D. Cal. 2016); *see also Wright*, 2020 WL 977963, at *8 (distinguishing between "a failure to implement suicide prevention protocols at a 'policy level'" and deliberate indifference to a particular inmate's needs).

Citing their experts, Plaintiffs identify the following DOC policies and practices that they contend "obviously put inmates at risk of serious harm":

> • A defective "suicide prevention system" that, with "reckless disregard" to the obvious consequences for suicidal inmates: (1) lacked a strategy to document critical information regarding the suicide risk of violators such as Anthony Christie and to provide that information to the healthcare and custody staff responsible for the prevention of suicide; (2) ignored "multiple sources of information in the community"; (3) failed to retrieve "prior records despite the knowledge that they could contain critical information regarding suicide risks"; (4) failed to provide "safe housing of suicidal inmates and safety monitoring by correctional officers"; (5) operated on an *all or nothing* principle that the offender is either suicidal or not suicidal; (6) "failed to provide minimally adequate behavioral health treatment"; (7) failed to develop and implement an effective suicide risk assessment protocol";

(8) did not employ "competent and supervised mental health clinicians"; and (9) "failed to provide a sufficient number of mental health clinicians to provide comprehensive suicide risk assessments and mental health treatment for inmates with an elevated risk of suicide."

• Maintenance of a Violator Confinement policy that "lacks purpose, responsibilities, and clear direction" by (1) "not provid[ing] a directive regarding maintaining medical or mental health screening forms or reviewing prior forms for Violators if they return on subsequent violations"; (2) not requiring sufficient training; and (3) failing to adequately define "security rounds and tier checks" and "restrictive housing" in the Violator Unit.

Dkt. 77 at 28 (internal citations omitted).

Plaintiffs argue that Martin, Herzog, Currey, and Warner should be held liable for implementing these policies. *Id.* But as the law existed at the time of Anthony's death, it would not have placed these defendants on notice that their implementation of the policies violated Anthony's constitutional rights. Martin, Herzog, Currey, and Warner are thus entitled to qualified immunity for the claims against them based on their role in implementing DOC policy.

The Court will address Plaintiffs failure-to-train claims against these Defendants in a later section.

### 2.   *Whether Plaintiffs can show Defendants' conduct violated a federal right*

Pretrial detainees have a "constitutional right to adequate medical treatment" under the Fourteenth Amendment. *Sandoval*, 985 F.3d at 887 (citing *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)). As discussed above, this includes treatment based on the detainee's mental health and risk of suicide. To establish a claim for failure to provide constitutionally adequate medical care to a pretrial detainee, a plaintiff must show:

(1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined [including a decision with respect to medical treatment];

(2) Those conditions put the plaintiff at substantial risk of suffering serious harm;

(3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and

(4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Sandoval*, 985 F.3d at 669 (quoting *Gordon I*, 888 F.3d at 1125) (alteration in original). "To satisfy the third element, the plaintiff must show that the defendant's actions were 'objectively unreasonable,' which requires a showing of 'more than negligence but less than subjective intent—something akin to reckless disregard.'" *Id.* (quoting *Gordon I*, 888 F.3d at 1125).

        *a)*     *Personally participating defendants:*

        (1)    <u>Gravatt</u>

Gravatt was an RN3 "medical supervisor for the IMU" VU. Dkt. 78-14 at 5. She was not working on September 20 or 21, 2019, but she documented Anthony's mental health history for his August 2019 MCC intake. *Id.* at 11. On August 7, 2019, Gravatt filled out his "Restricted Housing Mental Health Screening" form. Dkt. 78-16. Although mental health professionals usually complete this form, Gravatt said she completed Anthony's to help the busy and understaffed mental health team. Dkt. 78-14 at 10–11.

Plaintiffs argue that Gravatt failed to complete the form accurately by omitting that Anthony reported experiencing hallucinations. Dkt. 77 at 12. But the form asks whether the individual has experienced hallucinations when *sober*, whereas Anthony disclosed experiencing hallucinations when *high* on methamphetamine. *Compare* Dkt. 17-16 at 2 *with* Dkt. 78-14 at 8. More importantly, there is no evidence that including this information on the form would have changed anything about Anthony's September 2019 detention, even if the medical and mental health staff did review the form.

Next, Plaintiffs argue that Gravatt failed to properly update the severity of Anthony's mental health needs and suicide risk into the PULHES coding system. Dkt. 77 at 13–14. They contend that appropriate coding of Anthony's suicide risk would have required placing him in a mental health residential treatment unit rather than in solitary confinement at MCC. Dkt. 77 at 14 (citing Dkt. 78-3; Dkt. 78-31 at 14).

When he was detained in August 2019, Anthony had PULHES codes of S1, indicating "[n]o serious mental health symptoms currently evident but may have mild symptoms. Adaptive functioning (e.g., programming, school, occupational, social) in the general population is adequate without mental health treatment. Manages problems adequately. Does not require ongoing mental health counseling or psychotropic medications," and R1, indicating "[n]o reported history of self-harm behavior with the intent to die." Dkt 78-3 at 8–9; Dkt 78-31 at 14. Plaintiffs' expert, Sean Price, asserts that based on the information Gravatt collected during his August 2019 intake, Anthony's "R" code should have been updated to be R4, which indicates "[a] reported or documented history of self-harm behavior with the intent to die within the past 6 months." Dkt. 78-3 at 9, Dkt. 78-31 at 15. Price does not comment on Anthony's "S" code, but Plaintiffs argue it should have been S4, which indicates:

> Significant major mental disorder; serious symptoms evident. Symptoms result in serious impairment in adaptive functioning and may include a safety risk for the Incarcerated Individual and/or others; requires treatment in a mental health Residential Treatment Unit. Treatment typically includes stabilization on psychotropic medications and the development of self-management skills. Available resources must consist of onsite mental health providers and psychiatric practitioners. Incarcerated Individuals must be assigned to a Residential Treatment Unit (WSP, SOU, and WCCW).

Dkt. 78-3 at 8. An S code of 4 "[r]equires sub-acute or chronic treatment in a Mental Health Residential Unit (WSP, SOU, or WCCW). Resources include MHP's and psychiatric support

onsite." *Id.* at 8. While an "R code will not influence a person's placement," "[a] person with an R3 cannot have an S code lower than 2." *Id.* at 9.

Defendants argue that under the policy for the PULHES coding system, *mental health* providers are to input the codes, and as a *medical* nurse, Gravatt is not responsible for doing so. Dkt. 85 at 5. But even if it was Gravatt's responsibility to input the R and S codes, plaintiffs have not shown that a PULHES code corresponding to Anthony's August 2019 detention would have impacted his intake in September 2019.

Finally, Plaintiffs argue that Gravatt demonstrated deliberate indifference by failing to alert a mental health professional of Anthony's high risk of suicide as required by DOC and MCC policy. Price asserts that Gravatt should have informed mental health professionals of Anthony's history of self-harm, attempted "suicide by cop," and suicidal thoughts so that mental health staff could properly conduct a mental health assessment and update his PULHES codes to reflect his suicide risk. Dkt. 78-31 at 14–15. But Price also notes that a "screening completed by a provider that does not specialize in mental health will be reviewed by a mental health employee/contract staff the next business day" pursuant to DOC policy. *Id.* at 14.

Further, even if a mental health employee did review Anthony's form or otherwise follow up with him, neither party has presented evidence from which a jury could conclude that such a follow-up would have resulted in any changes to his September 2019 detention. Nor is there evidence showing such a follow-up would have led Anthony to treatment.

Thus, even if any of these actions constituted objective deliberate indifference, there is not evidence from which a jury could find that Gravatt caused Anthony's injuries or violated his right to medical care, including suicide prevention. Gravatt is entitled to qualified immunity.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

(2)   <u>Angell</u>

Angell was a DOC Corrections Officer. Dkt. 78-19 at 5. When he and Hall were conducting a formal standing count around 4:00 p.m. on September 21, 2019, they discovered Anthony lying face-down on the floor next to his bed. *Id.* at 10; Dkt. 71-18 at 4, 6. Angell noted that Anthony's head and neck were under a desk and obstructed from view. *Id.* at 4. He also reported noticing that one of Anthony's flip flops had fallen off. *Id.* Angell and Hall knocked on the door and instructed Anthony to move for count but he did not move or respond. Dkt. 78-19 at 10. They tried to awaken Anthony to no avail. Dkt. 71-18 at 6. Angell requested assistance by radio to "go in to make sure that" the inmate is "okay and not having some kind of medical issue." Dkt. 78-19 at 12. He noted that they request assistance in part for safety concerns: "in case when we do go in to make sure that they're all right that they don't get up and try and fight us." *Id.* at 12. When two other corrections officers came to assist, Angell and Hall continued the count. Dkt. 70-1 at 110. They "reported back to the cell to provide additional support" once they completed it. Dkt. 71-18 at 6. After receiving authorization from a sergeant,[9] the assisting staff members opened Anthony's cell door about two minutes after Angell and Hall discovered Anthony on the ground of his cell. Dkt. 78-19 at 11.

Plaintiffs argue that either "(1) Angell conducted a count, found an inmate that was dead . . . and did nothing; or (2) Angell conducted a count, found an inmate that was dying, and did nothing to prevent his death." Dkt. 77 at 15. But neither party has offered evidence to counter the expert opinion of Dr. Sperry "that Anthony Christie had been dead for a period of several hours when his body was discovered." Dkt. 78-43 at 7. Nor does any evidence show that Angell could

---

[9] According to Angell, officers cannot enter the cell without authorization from the sergeant or lieutenant for safety reasons. Dkt. 78-19 at 13.

have, but did not, prevented Anthony's death. Even if one might view the delay in entering Anthony's cell after he failed to respond as callous, there is simply no evidence from which a jury could conclude that it contributed to his death. Angell is therefore entitled to qualified immunity because his actions did not cause Anthony's injuries. *See Sandoval*, 985 F.3d at 669.

(3)   <u>Hall</u>

Hall was a DOC corrections officer who worked an overtime shift in the VU on September 21, 2020. Dkt. 78-21 at 6–7. Hall performed the 4:00 p.m. formal standing count with Angell. Hall is entitled to qualified immunity for his actions during the formal standing count for the same reasons as Angell.

Hall also performed the 2:00 p.m. and 3:00 p.m. tier checks, which require the officer to "look in a cell to see if the individual's in their []cell, and if they're alive." *Id.* at 10, 13. There is no evidence that Hall was aware of a heightened risk for Anthony compared to other detainees. Hall testified that he recalls seeing Anthony asleep on his bed, "probably under the covers," when he reached his cell at 2:16 p.m. and 3:13 p.m. *Id.* at 13–14, 16. He explained that officers cannot "really [say] that the individual is alive or not, because it's a certain distance" between the cell door and the bed, but an officer might be able to confirm the individual is alive by seeing that an arm or leg is not purple, or by seeing that the individual is breathing. *Id.* at 17. But he admitted that "honestly, I cannot say that I . . . saw him breathing due to the distance between the []cell door and then the []bed and breathing habits and covers on him." *Id.* at 18. Video footage of each tier check shows Hall briefly glance in a small window on Anthony's cell door as he walked by without pausing. Dkt. 22 at 14:17:32; Dkt. 23 at 15:13:40–42.

Plaintiffs argue that Hall was deliberately indifferent while performing the tier checks by failing to ensure Anthony was alive. Dkt. 77 at 18. They note Dr. Sperry's expert opinion that Anthony "did not die 'shortly prior to being checked in his cell'" around 4:00 p.m., *id.* (quoting

Dkt. 78-43 at 7), and they contend that "[h]e was likely in the process of dying during one of" the tier checks, *id.* Plaintiffs argue that "a reasonable juror could find that Defendant Hall's failure to check that Anthony was alive *at all* in the preceding three hours put him at an increased risk of substantial harm." *Id.* A reasonable juror could also doubt whether Hall even saw Anthony on the bed at 2:00 or 3:00 p.m. in his brief glance towards the cell window, given Dr. Sperry's time-of-death testimony and Hall's equivocal memory; weighing the credibility of such testimony is the jury's traditional role.

This claim thus exemplifies the arbitrary impact of qualified immunity jurisprudence on individual litigants. In July 2021, the Ninth Circuit held in *Gordon II* that pre-trial detainees like Anthony have a due process right "to direct-view safety checks sufficient to determine whether their presentation indicates the need for medical treatment." 6 F.4th at 973. Had Anthony's death occurred after *Gordon II*, the evidence Plaintiffs have presented would be sufficient for a reasonable jury to conclude, viewing the facts in Anthony's favor, that Hall's tier checks were so cursory they demonstrated deliberate indifference to that right. But because Anthony died less than two years earlier, before the *Gordon II* court clarified that this right was "clearly established," qualified immunity takes that decision away from the jury, and the Section 1983 claims against Hall must be dismissed. *See, e.g.*, *Nicholson v. City of Los Angeles*, 935 F.3d 685, 690 (9th Cir. 2019) (requiring a right to be clearly established "at the time of the alleged misconduct").

(4)     Herrington

Herrington was a Licensed Mental Health Counselor (LMHC) and worked at DOC as a Psychological Associate. Dkt. 78-24 at 2. She conducted Anthony's Housing Mental Health Screening on September 20, 2019. *Id.* During that assessment, Anthony denied that he had ever received therapy or medication for a mental health concern or suicide attempt, denied that he had

ever tried to hurt or kill himself, and said he did not feel he needed mental health services. Dkt. 78-24 at 2.

Herrington testified that she reviewed the mental health records of inmates from prior detentions at MCC as part of the screenings "[i]f they were available," but "[t]hey were not always available ahead of time." Dkt. 78-25 at 10. She explained that "they may be in the binder that gets put together for the person before they come in. Otherwise, they were archived in a file room." *Id.* Although she would review records in the binder when conducting a mental health screening, she would not retrieve and review the archived records. *Id.*

Plaintiffs argue that Herrington's conduct constitutes deliberate indifference because she could have, but chose not to, become aware of Anthony's suicide risk factors by retrieving his previous records from the file room or accessing the "Chronos" database. Dkt. 77 at 19. They argue that based on her testimony, had she reviewed these records, she would have asked Anthony follow up questions as to certain red flags, and if his answers "endorsed suicidality," she would have performed "a suicide risk screen detection and a suicide risk assessment." Dkt. 77 at 19 (quoting Dkt. 78-25 at 26). Ultimately, they argue that according to their expert, a "comprehensive risk assessment would have required placing Mr. Christie on suicide precautions and developing a safety plan to reduce his risk of suicide." *Id.* at 19 (quoting Dkt. 78-44 at 11).

Viewing this evidence in the light most favorable to Plaintiffs, and drawing all reasonable inferences in their favor, this evidence provides strong support for the Estate's negligence claim against DOC. But it does not allow a reasonable jury to find that Herrington's conduct constituted objective deliberate indifference. The test for objective deliberate indifference under *Sandoval* and *Gordon I* requires a showing that the defendant "did not take reasonable available measures to abate" the risk of serious harm to a detainee, even though a reasonable official "would have appreciated the high degree of risk involved—making the consequences of the

defendant's conduct obvious." *Gordon I*, 888 F.3d at 1125. The plaintiff must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* (citation omitted). The evidence in the record does not support a finding that it would have been obvious to a reasonable official in Herrington's position that failing to review Anthony's mental health records from his earlier detentions placed him "at substantial risk of suffering serious harm." *Id.*

Plaintiffs cite *Galley v. County of Sacramento*, No. 2:23-CV-00325 WBS AC, 2023 WL 6129785, at *2 (E.D. Cal. Sept. 19, 2023), in which the court applied *Gordon I* to conclude that a medical screening nurse plausibly acted with deliberate indifference by not implementing alcohol detoxification and withdrawal measures. Dkt. 77 at 24. The court reasoned that she should have known of information in the decedent's jail medical records when he had been detained in jail multiple times and regularly informed jail staff of his alcohol dependency. *Galley*, 2023 WL 6129785, at *2. But in *Galley*, the nurse knew that she was conducting a screening *because of* the earlier records and, crucially, the decedent "exhibited clear signs of alcohol impairment while [the nurse] was medically screening him." *Id.* Had Anthony exhibited clear signs of suicidality during his screening, or had other information alerted Herrington to an obvious risk from failing to review his earlier records, the claims against Herrington would likely proceed. But that is not the evidentiary record before this Court. Herrington therefore is entitled to qualified immunity.[10]

---

[10] Plaintiffs cite *Galley*, 2023 WL 6129785, and several other cases in which a medical provider failed to review a detainee's medical records. Dkt. 77 at 34–35 (collecting cases). This Court agrees that the failure to review medical records can demonstrate deliberate indifference under the Eighth or Fourteenth Amendment in certain factual contexts. But the cases cited are not analogous to the facts here.

(5)    <u>Bushey</u>

A Registered Nurse in the VU, Bushey conducted Anthony's medical intake screening on September 20, 2019. Dkt. 78-26. Plaintiffs argue that, like Herrington, Bushey acted with deliberate indifference because he had access to Anthony's records but chose not to review them. Dkt. 77 at 20. They cite Bushey's deposition testimony that if he learned an inmate recently attempted self-harm, he would have informed the mental health department. Dkt. 77 at 20 (citing Dkt. 78-27 at 39). They contend that had he done so, Herrington would have followed up as to Anthony's risk of suicide, and DOC would have taken suicide precautions. *Id.* at 20–21 (quoting Dkt. 78-44 at 11). For the same reasons pertaining to Herrington discussed above, although this evidence is relevant to DOC's alleged negligence, it is not sufficient to support a finding of objective deliberate indifference, and Bushey is entitled to qualified immunity.

(6)    <u>Miller</u>

Miller was Anthony's community corrections officer from May 2018 until his death. Dkt. 78-13 at 5, 7. Plaintiffs allege that Miller's conduct constituted deliberate indifference because (1) he was aware of Anthony's risk of suicide but did not report that risk to jail officials when he booked Anthony on September 19, and (2) he did not compel or sufficiently encourage Anthony to seek mental health treatment. Dkt. 77 at 25.

As to Plaintiffs' first theory of Miller's deliberate indifference, when Miller arrested Anthony on March 25, 2019, Anthony said "he wanted to not be alive be anymore" and that "he is suicidal all the time." Dkt. 71-2 at 12. Miller had regular contact with Anthony in the months between that arrest and his suicide. *See generally id.* While Miller testified that Anthony did not tell him that he was suicidal when Miller booked him in WCJ on September 19, 2019, Dkt. 70-1 at 34, Trina repeatedly called Miller raising concerns about Anthony's suicidality. Dkt. 78-33 at 6. She testified that the last few times she called Miller, she "[a]bsolutely" told him she was

concerned about Anthony's suicidality. *Id.* at 7–8. Miller was also aware that Anthony had several suicide risk factors, including addiction to alcohol and methamphetamine. *See generally* Dkt. 71-2. A reasonable jury could find that Miller knew or should have known that Anthony's suicidality was recent, persistent, and serious.

In *Conn v. City of Reno*, the Ninth Circuit held that a jury could find deliberate indifference (even under the stricter subjective standard) from the failure of arresting police officers to inform jail personnel of a detainee's substantial risk of suicide. 591 F.3d at 1094–99. Defendants argue that *Conn* is not analogous because the officers there witnessed the detainee's acute suicidality during her arrest, while Miller testified that Anthony did not express suicidal ideation to him on the last arrest before his death. *See* Dkt. 85 at 6–7. But the import of *Conn* is that the failure to communicate knowledge of an arrestee's serious risk of suicide can establish deliberate indifference. That Miller's knowledge of Anthony's risk was based on many contacts over the past six months rather than one dramatic incident during the arrest is not a meaningful distinction. Miller made an intentional decision to arrest Anthony and cause his incarceration without passing on his knowledge of Anthony's suicide risk. Based on *Conn*, there is sufficient evidence to put to the jury the questions whether that decision placed Anthony at substantial risk of serious harm, whether a reasonable official in Miller's position would have appreciated the risk, and whether Miller's failure to provide that information was a proximate cause of Anthony's death. *See Gordon I*, 888 F.3d at 1125; *see also* Dkt. 71-6 at 9 (testimony that jail mental health records would typically go with the inmate to DOC). Miller's motion for qualified immunity is denied.

As to Plaintiffs' second theory of Miller's deliberate indifference, the record shows that Miller *did* encourage Anthony to seek mental health treatment at multiple points throughout his community custody sentence. *See, e.g.*, Dkt. 71-2 at 5, 29. And Miller testified that given

Anthony's difficulty complying with his existing court-ordered conditions of community custody, he did not think adding mental health treatment as an additional term of Anthony's supervision was likely to succeed. Dkt. 70-1 at 18–19. Plaintiffs have not offered contrary evidence or shown that Miller's failure to encourage or impose additional mental health treatment violated a clearly established right. Miller is entitled to qualified immunity as to this theory.[11]

### b)      Supervisory and policymaking Defendants

Section 1983 does not authorize liability under the theory of respondeat superior. *Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). "A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1205–06 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). To show direct liability, a "plaintiff must show the supervisor breached a duty to plaintiff which was the proximate cause of the injury." *Redman v. County of San Diego*, 942 F.2d 1435, 1446–47 (9th Cir. 1991). Direct liability exists "even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" *Id.* at 1446 (quoting *Hansen*, 885 F.2d at 646).

---

[11] Even if Plaintiffs had offered more evidence on this theory, Miller would be entitled to quasi-judicial immunity for his decisions regarding the imposition of community custody conditions. *Swift v. California*, 384 F.3d 1184, 1188–91 (9th Cir. 2004).

"The requisite causal connection" exists where the supervisor "sets in motion a 'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms," *Corales v. Bennett*, 567 F.3d 554, 570 (9th Cir. 2009), or "knowingly refus[es] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury," *Starr*, 652 F.3d at 1207–08. "A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Id.* at 1208 (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998)).

Plaintiffs make several arguments for supervisory liability based on a theory of ratification. Dkt. 77 at 10–11, 29–30. Ratification is typically a theory of *Monell* liability that Plaintiffs concede is not at issue in this case against a state agency and its employees. *See* Dkt. 77 at n.1. Although the Ninth Circuit has allowed evidence of ratification to be used to support individual supervisory liability, *see Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991), "the circumstances of the ratification must also demonstrate that the supervisor had previously set in motion acts of others which caused the others to inflict a constitutional injury." *Peschel v. City of Missoula*, 686 F. Supp. 2d 1092, 1102 (D. Mont. 2009) (citing *Larez*, 946 F.2d at 645–46); *Leibel v. City of Buckeye*, 364 F. Supp. 3d 1027, 1040 (D. Ariz. 2019) (same).

(1)   Hallgren

Hallgren was a Lieutenant of the MCC Special Offender Unit, which includes the VU. Dkt. 78-41 at 6–7. He supervised VU sergeants and corrections officers, including Sergeant Mull, Sergeant Rose, Hall, and Angell. *See* Dkt. 78-41 at 8.

Plaintiffs argue Hallgren ratified his subordinates' decisions because he testified in his deposition that he approved of their "actions . . . and the basis for them" on the day Anthony died. Dkt. 77 at 29. Taken in the light most favorable to Plaintiffs, this is not enough to establish individual liability. Plaintiffs have not offered evidence showing that Hallgren personally participated in or directed the violations. Nor have they shown that he implemented a constitutionally deficient policy or ratified or encouraged behavior that set in motion a constitutional violation by others. *See Larez*, 946 F.2d at 646 (not plain error to allow theory that police chief "condoned, ratified, and encouraged the excessive use of force" where jury was correctly instructed that to be liable in his individual capacity, chief must have set in motion or refused to terminate a series of acts which he knew or should have known would result in constitutional injury). Testifying in a deposition that he approved of his subordinates' conduct is not sufficient to establish individual liability through ratification. Hallgren is entitled to qualified immunity.

(2)   <u>Mull</u>

Mull was a Sergeant at the MCC VU. Dkt. 78-42 at 6–7. She supervised six corrections officers. *Id.* at 7. She started a shift at 2:00 p.m. on September 20, 2019. *Id.* at 8. Mull responded to Hall's radio call when he found Anthony nonresponsive. *Id.* at 9. She described the incident in her deposition testimony as follows:

> When I looked inside the window, I saw the offender laying on the floor, his back, I believe, was turned to me, and all I could see was something around his neck from the back, and part – part of this body was kind of – his head []kind of underneath the – the sink. And as soon as I saw that and I saw no movement, I immediately notified control booth to open that cell so we can go in . . . and see what was going on with the offender and why he wasn't moving or responding.

*Id.*

1
2
3
4
5

Plaintiffs argue that "Mull ratified the acts and omissions of her subordinates by testifying that in her 'professional opinion as their supervisor' the corrections officers she supervised (including Defendants Hall and Angell), complied 'with DOC policy and established practices.'" Dkt. 77 at 30 (quoting Dkt. 78-42 at 9). Mull is entitled to qualified immunity for the same reasons as Hallgren.

6

(3)   Martin, Herzog, Currey, and Warner

7
8
9
10
11
12
13
14

Plaintiffs argue that policymakers Martin, Herzog, Currey, and Warner failed "to adequately train CCOs or provide 'clear instruction/policy on treatment referrals, follow-ups, interactions with treatment providers, etc.'— a 'large gap in DOC policy that would obviously result in serious harm or even death to offenders.'" Dkt. 77 at 28 (internal citations omitted). But they cite nothing in the record to show that Martin, Herzog, Currey and Warner's training was constitutionally inadequate, nor do they specify how their actions caused a violation of Anthony's clearly established rights. Defendants Martin, Herzog, Curry, and Warner are thus entitled to summary judgment as to the failure to train claims.

15

**D.   Familial association claim**

16
17
18
19
20
21
22
23
24

The Court turns to Plaintiffs' Fourteenth Amendment claims for impermissible interference with familial association. "Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct." *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013). To prevail on a Fourteenth Amendment familial association claim, Plaintiffs must show that the official conduct "shocks the conscience." *Id.* (citing *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)). Where an official "makes a snap judgment because of an escalating situation," the "purpose to harm" standard applies. *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) Where, as here, actual deliberation was practical

under the circumstances, "an officer's deliberate indifference may suffice to shock the conscience." *Nicholson*, 935 F.3d at 692–93 (quoting *Wilkinson*, 610 F.3d at 554). And because Anthony was a detainee, the same "objective" deliberate indifference applicable to his mental health care claims applies to this claim as well. *See Castro*, 833 F.3d at 1070–71.

The Court has already ruled on whether Plaintiffs have presented evidence sufficient to meet the objective deliberate indifference standard for each individual defendant. And Defendants have not asserted a distinct qualified immunity defense as to Plaintiffs' familial association claims. The Court thus reaches the same conclusion as it did for Plaintiffs' other Fourteenth Amendment claims—only the claim against Defendant Miller may go forward.

**E.      Discretionary immunity**

Defendants argue that DOC is entitled to discretionary immunity regarding its formation of policy. Dkt. 68 at 24. But Plaintiffs have clarified that they are not advancing a claim based on a deficient DOC policy (as opposed to negligent implementation of policies) or other high-level decision that would be subject to discretionary immunity. Dkt. 81 at 4. DOC's motion based on discretionary immunity is denied as moot.

**F.      Quasi-judicial immunity**

Defendants argue that DOC and Miller are entitled to quasi-judicial immunity for any negligence claim based on the setting, modifying, and enforcing conditions of community custody. Dkt. 68 at 25. Plaintiffs clarify that they "do not take issue with Defendant Miller's setting, modifying, or enforcing Anthony's conditions of custody." Dkt. 77 at 52. The Court has addressed above the application of quasi-judicial immunity to Plaintiffs' claims that Miller should have encouraged or required Anthony to engage in mental health treatment. *See supra* n. 11. The motion for summary judgment on this basis is otherwise denied as moot.

**G.    Claims under RCW 4.24.010**

Defendants argue that Trina may not bring a claim under RCW 4.24.010 in her personal capacity. Plaintiffs clarify that Trina has not. *See* Dkt. 77 at 2 n.1 (citing Dkt. 40-1 ¶¶ 76–94). Defendants' motion on this basis is denied as moot.

**H.    Negligence claim**

Defendants argue that Plaintiffs' claim alleging DOC breached its "common law duty to ensure inmates' health, welfare, and safety" fails because Plaintiffs fail to show sufficient evidence of causation. Dkt. 68 at 26–27 (citing *Gregoire v. City of Oak Harbor*, 170 Wash. 2d 628, 635 (2010) (plurality opinion)).

Under Washington state law, the elements of a negligence cause of action are the existence of a duty to the plaintiff, breach of the duty, and injury to plaintiff proximately caused by the breach." *Hertog v. City of Seattle*, 138 Wash. 2d 265, 275, 979 P.2d 400 (1999). Proximate cause consists of two elements: cause-in-fact and legal causation. *Hartley v. State*, 103 Wash. 2d 768, 777, 698 P.2d 77 (1985).

"Cause in fact concerns 'but for' causation, events the act produced in a direct unbroken sequence which would not have resulted had the act not occurred." *Hertog*, 138 Wash. 2d at 282–83. "When the connection between a defendant's conduct and the plaintiff's injury is too speculative and indirect, the cause in fact requirement is not met." *Taggart v. State*, 118 Wash. 2d 195, 227 822 P.2d 243 (1992). "Establishing cause in fact involves a determination of what actually occurred and is generally left to the jury." *Schooley v. Pinch's Deli Market*, 134 Wash. 2d 468, 478, 951 P.2d 749 (1998). "Legal cause" is grounded in policy determinations about how far the consequences of a defendant's acts should extend. *Id.* "Where the facts are not in dispute, legal causation is for the court to decide as a matter of law." *Id.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Defendants' motion for summary judgment on causation fails on both grounds. The connection between DOC's alleged breach of its duty to ensure Anthony's safety while in custody and his death by suicide is not too speculative and indirect for a jury to find cause in fact. *See Taggart*, 118 Wn.2d at 227. Nor is that connection so "remote or insubstantial" as to preclude liability against DOC as a matter of policy. *See Schooley*, 134 Wn.2d at 478–79. As discussed throughout this order, Plaintiffs have presented abundant evidence from which a jury could reasonably find that but for the failure to consolidate and review the numerous records in DOC's possession showing Anthony's heightened risk of suicide, DOC would have taken additional measures during his final incarceration that would have prevented his death, just as they had during his previous detentions. DOC may ultimately persuade a jury otherwise, but it is not entitled to judgment on causation as a matter of law.

## IV.   DEFENDANTS' MOTION TO STRIKE

In their reply brief, Defendants move to strike three exhibits submitted by Plaintiffs in opposition to summary judgment: Dkt. 78-28, a printout of cell phone records; Dkt. 71-18, a DOC "Incident Review Report" regarding Anthony's death; and Dkt. 71-20, a report from the Office of the Corrections Ombuds on Anthony's death. Dkt. 85 at 2.

The Court DENIES the motion to strike Dkt. 78-28 as moot because the Court has not relied on that document in ruling on the summary judgment motion.

The Court DENIES the motion to strike Dkt. 71-18. Defendants argue the "Incident Review Report" is not capable of admission into evidence because it is a subsequent remedial measure under Federal Rule of Evidence 407. Dkt. 85 at 2. This argument is unpersuasive. Evidence of retrospective department investigations that "assess what happened . . . without meting out discipline or changing . . . policy" is not excluded by FRE 407. *Aguilar v. City of Los*

Angeles, 853 F. App'x 92, 95 (9th Cir. 2021) (holding it was error for district court to exclude findings of in-custody death investigation).

The Court also DENIES the motion to strike Dkt. 71-20. Although the Court will entertain further argument as to the admissibility of this document at trial, it is relied on in the summary judgment order only to summarize DOC's "red folder" policy, the underlying facts of which are capable of admission through other witnesses even if the document is excluded. *See* Fed. R. Civ. P. 56(c)(2) (evidence cited to at summary judgment must be capable of presentation "in a form that would be admissible in evidence").

## V.    CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment in part and DENIES it in part. The Court ORDERS as follows:

- Summary judgment is GRANTED as to the Section 1983 claims against Defendants Kody Angell, Troy Bushey, Mary Jo Currey, Elaine Gravatt, William Hall, Christopher Hallgren, Valarie Herrington, Rob Herzog, Julie Martin, Dianna Mull, and Jack Warner. These claims are DISMISSED with prejudice.

- Summary judgment is DENIED as to the Section 1983 claims against Defendant Jacob Miller.

- Summary Judgment is DENIED as to the negligence claims against the State of Washington Department of Corrections.

- Plaintiffs are further ORDERED to show cause within fourteen days why the Court should not dismiss the John Doe defendants *sua sponte*, as Plaintiffs have not put forward any evidence that they have ascertained the identity of additional defendants through discovery. *See Wakefield v. Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999).

Dated this 26th day of August, 2024.

Tiffany M. Cartwright
United States District Judge